

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00070-CV

IN THE INTEREST OF C.D. AND
K.D., CHILDREN

----------

FROM THE 89TH DISTRICT COURT OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1]

----------

Appellants M.D. (Mother) and J.D. (Father) appeal the termination of their

parental rights to their children C.D. (Caitlin) and K.D. (Kristen).[2] Appellant A.A.

(Grandmother)[3] appeals the termination of her permanent managing

---

[1]*See* Tex. R. App. P. 47.4.

[2]We use aliases for all of the children and all foster parents and adoptive parents throughout this opinion. *See* Tex. R. App. P. 9.8(b)(2).

[3]Grandmother is the biological grandmother of Mother and adopted Mother when she was born. She is therefore both the grandmother and great-grandmother of the children.

conservatorship of Caitlin and Kristen. A jury found by clear and convincing evidence that Mother and Father had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangers the children's physical or emotional well-being; that Mother constructively abandoned the children; and that termination of the parent-child relationship would be in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (2) (Vernon Supp. 2010). The jury also found that the children's current foster parents (the Sullivans) should be their permanent managing conservators.

In four issues, Father challenges the legal and factual sufficiency of the evidence supporting the jury's endangerment findings. In six issues, Mother challenges the legal and factual sufficiency of the evidence supporting the jury's endangerment findings and the finding that Mother constructively abandoned the children. Neither Mother nor Father challenges the jury's finding that it would be in the children's best interest to be placed with the Sullivans.

Grandmother challenges the trial court's order terminating her conservatorship; the trial court's failure to submit a jury question on whether Grandmother should be named as possessory conservator; the trial court's denial of her motion to strike the intervention of the Sullivans; and the termination of the parent-child relationship of both Mother and Father. Grandmother's submission on appeal is one paragraph containing no legal authorities or

argument on her issues. While we note that Grandmother prepared her brief without the assistance of counsel, we also recognize that pro se litigants must abide by the same standards as licensed attorneys and comply with applicable laws and rules of procedure. *See Wheeler v. Green*, 157 S.W.3d 439, 444 (Tex. 2005) (stating that pro se litigants "are not exempt from the rules of procedure" and suggesting that "[h]aving two sets of rules—a strict set for attorneys and a lenient set for pro se parties—might encourage litigants to discard their valuable right to the advice and assistance of counsel"); *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 185 (Tex. 1978) ("Litigants who represent themselves must comply with the applicable procedural rules, or else they would be given an unfair advantage over litigants represented by counsel.").

Texas Rule of Appellate Procedure 38.1(i) states that an appellant's "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." Tex. R. App. P. 38.1(i). Furthermore, as a general rule, an appellate court will not consider an issue raised by an appellant where the appellant fails to provide any legal argument to support his claim. *See Hamilton v. Williams,* 298 S.W.3d 334, 337 (Tex. App.—Fort Worth 2009, pet. denied). This is so because an issue unsupported by citation to any legal authority presents nothing for the court to review. *AMX Enters., L.L.P. v. Master Realty Corp.*, 283 S.W.3d 506, 525 (Tex. App.—Fort Worth 2009, no pet.) (citing *Strange v. Cont'l Cas. Co.*, 126 S.W.3d 676, 678 (Tex. App.—Dallas 2004, pet. denied (2005)). Grandmother has failed to

3

adequately brief her issues and to preserve her complaints. We therefore overrule all of Grandmother's issues. We address Mother's and Father's issues below.

## I. Factual and Procedural Background

Mother was first married in 1999 when she was sixteen years old. Mother's first child, Christopher, was born in 2002. Grandmother testified that she took care of Christopher because Mother "was not a responsible mother." Child Protective Services (CPS) removed Christopher because Mother's brother, John, called them to report that Mother had put Christopher (then two or three months old) in the front seat of her car and "fishtailed" out of a driveway. John and his wife Brenda took conservatorship of Christopher. Mother voluntarily relinquished her parental rights to Christopher in 2006 because, according to Grandmother, "she felt that he had been with them long enough that it wasn't right to even try to get him back."

Mother remarried and had her second child, Katrina, in 2004. About nine days after Katrina was born, Mother dropped her after she had been drinking. CPS removed Katrina and placed her with Brenda and John. Also in 2004, Mother moved to Arkansas and passed two stolen checks with a total value of $610. She was placed on probation for four years. Mother's parental rights to Katrina were terminated in 2007 and John and Brenda adopted Katrina in 2008. John and Brenda were also in the process of adopting Christopher when John died.

4

Mother was pregnant with Caitlin when she met Father in 2005.[4]  Father, who was twenty-eight years old at trial, started taking drugs at age fourteen or fifteen.  By age sixteen, he was doing methamphetamines and LSD.  His first arrest was at age twenty-two for forgery.  At the time of trial, Father had been convicted of ten felonies.

Caitlin was born in January 2006.  Between February 2006 and May 2007, Mother also passed approximately twenty-three bad checks with a total value of $4,925.48.  In April 2007, Mother stole Grandmother's debit card and used it to make $2,071.84 in unauthorized purchases.

Kristen was born in January 2007.  The hospital kept Kristen for about ten days to treat her for strep.  Before Kristen was released to go home, Mother and Father were arrested.  Their roommate had reported to the police that Father had been "up for a week on drugs" and had threatened to beat her up.  Police found nine baggies of marijuana, which Father admitted to smoking with Mother, and a digital scale.  Father also admitted that he used a pipe found in the bathroom for smoking methamphetamine.  Father was convicted of the possession of a controlled substance and drug paraphernalia, and sentenced to five years and released on parole after ten months.  The possession charges against Mother were dropped, but she went to prison for the fraudulent use of Grandmother's

---

[4]Father is not Caitlin's biological father.  He is the adjudicated father and is listed as her father on her birth certificate.  Mother's ex-husband, J.I., Caitlin's presumed father, and J.D.C., Caitlin's alleged father, both had appointed counsel below and were both dismissed from the suit in an agreed order.

debit card and the violation of Arkansas's Hot Check Law.  *See* Ark. Code Ann. § 5-37-302 (2010).  Her probation for her first hot check violation in 2004 was also revoked.  An Arkansas court gave Grandmother temporary possessory conservatorship of Caitlin and Kristen after the parents were arrested.  She returned to Texas with the children.

Mother was released in April 2008 and came to Texas to live with Grandmother.  Mother got a job but quit after about a month.  Instead of paying child support to Grandmother as ordered by the Arkansas court, Mother used the money she earned to move back to Arkansas to be with Father, leaving the kids with Grandmother in Texas.  Grandmother testified that Mother stole some of her checks when she left.

In July 2008, Grandmother was arrested after leaving the children in a car while she went into a grocery store.  The children were taken into custody by CPS and CPS filed a petition to terminate Mother and Father's parental rights.  A hearing was held in August 2008, which both Mother and Father attended, but they were unable to take the children back because of "financial issues."  The children were placed in an emergency shelter and three successive foster homes before finally being placed with the Sullivans.[5]

In September 2008, Father was arrested for possession.  He was found with .3 grams of methamphetamine, ten grams of marijuana, one tablet of

---

[5]The Sullivans are Brenda's sister and brother-in-law.  Brenda is Mother's deceased brother's wife.

6

hydrocodone, and twenty-four tablets of alprazolam. He was convicted of possession of a controlled substance and sentenced to five years in prison. In October 2008, Mother was not living at a stable address, which was a violation of her parole, and she also returned to prison.

In January 2009, CPS filed a permanency plan with the trial court in which it stated that it was in the children's best interest that the Sullivans be granted permanent possessory conservatorship. The termination trial was held in January 2010. Father, who was released on parole, and Grandmother attended, and Mother, who was still incarcerated in Arkansas, appeared by counsel. The jury found that Mother and Father's parental rights should be terminated under section 161.001 of the family code and awarded permanent possessory conservatorship to the Sullivans. This appeal followed.

## II. Legal and Factual Sufficiency

Both Mother and Father complain that the evidence presented at trial is legally and factually insufficient to support the trial court's termination of their parental rights under section 161.001 of the family code.

CPS argues that because Mother did not file a motion for new trial in the trial court, Mother failed to preserve her factual sufficiency challenge. The family code states that an issue is preserved through "a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial." *See* Tex. Fam. Code. Ann. § 263.405(i) (Vernon 2008). However, the rules of civil procedure also require a motion for new trial to

7

preserve factual insufficiency complaints in jury trials.  Tex. R. Civ. P. 324(b)(2); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (applying Rule 324 to termination cases).  Mother timely filed a statement of points, which addressed both her legal and factual sufficiency challenge, but she did not file a motion for new trial.  Thus, she has not preserved her factual sufficiency challenge.  We overrule Mother's second, fourth, and sixth issues.  We will review only her legal sufficiency challenge below.  *See* Tex. R. Civ. P. 324.

## A.    Standards of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right."  *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *M.S.*, 115 S.W.3d at 547.  "While parental rights are of constitutional magnitude, they are not absolute.  Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right."  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (Vernon 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent.  *Holick*,

8

685 S.W.2d at 20–21; *In re M.C.T.*, 250 S.W.3d 161, 167 (Tex. App.—Fort Worth 2008, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this case, the State alleged proof under subsections (D) and (E) of section 161.001 of the family code as to Father, and subsections (D), (E), and (N) as to Mother. Sections (D) and (E) state that the court may order termination of the parent-child relationship if the court finds that the parent has either "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" or "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(D), (E). Section (N) allows for termination if the parent has constructively abandoned the child. *Id*. § 161.001(1)(N).

Termination decisions must be supported by clear and convincing evidence. *Id*. § 161.001; *see id*. § 161.206(a) (Vernon 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (Vernon 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness-credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the

appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parents violated subsection (D), (E), or (N) of section 161.001(1). Tex. Fam. Code Ann. § 161.001; *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

"Endanger" means to expose to loss or injury, to jeopardize. *Boyd*, 727 S.W.2d at 533; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical well-being was the direct result of the parents' conduct, including acts, omissions, or failures to act. *See J.T.G.*, 121 S.W.3d at 125; *see also* Tex. Fam. Code Ann. § 161.001(1)(E). Additionally, termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *J.T.G.*, 121 S.W.3d at 125; *see* Tex. Fam. Code Ann. § 161.001(1)(E). It is not necessary, however, that the parents' conduct be directed at the children

11

or that the children actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct standing alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). To determine whether termination is necessary, courts may look to parental conduct occurring both before and after the children's birth. *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.).

## B. Sufficient Evidence Supports Termination Under Section 161.001(E)

We hold that legally and factually sufficient evidence supports the jury finding that Father engaged in conduct that endangered the children's physical well-being and that legally sufficient evidence supports the jury finding that Mother engaged in conduct that endangered the children's physical well-being.

Neither parent has ever paid child support or otherwise contributed money for the children's care. After her release in 2008, Mother did not put her children first by staying with Grandmother in Texas and earning money to pay for her children's care. Instead what money Mother did make she used to move back to Arkansas to be with Father, leaving the children with Grandmother in Texas. Mother also stole some of Grandmother's checks when she left, with full knowledge that Grandmother was using her own money to support the children.

Neither parent has provided stable and sufficient housing for the children. Instead of staying at Grandmother's home with her children, Mother returned to Arkansas to be with Father. They were evicted from their home because they

12

could not pay their rent and Mother was homeless a few months later, thereby violating her parole. Father testified at trial that he was unable to provide the children with a stable home because he had only recently been released from prison. He said, "At this time I don't think it is wise for me to have possession of my kids because of the fact that I don't have a stable home to put them in, and I believe that's important."

Both parents have had life-long battles with drug addiction. There was testimony that Mother was addicted to cocaine and methamphetamine and that she smoked marijuana. Father testified to using marijuana, LSD, cocaine, and methamphetamine. Although Father testified that he is currently not addicted to drugs, he admitted that he had previously discontinued using drugs during Mother's pregnancy but began using again right after Kristen's birth. The drugs were found in the bedroom that Mother and Father shared with Caitlin.

Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Likewise, evidence of criminal conduct, convictions, and imprisonment prior to the birth of a child will support a finding that a parent engaged in a course of conduct that endangered the child's well-being. *J.T.G.,* 121 S.W.3d at 133. While imprisonment alone does not constitute a continuing course of conduct that endangers the physical or emotional well-being of a child, it is a fact properly considered on the issue of endangerment. *Boyd,* 727 S.W.2d at 533–34. The State need not show

13

incarceration was a result of a course of conduct endangering the child; it need only show incarceration was part of a course of conduct endangering the child. *Id.* Thus, if the evidence, including imprisonment, proves a course of conduct that has the effect of endangering the child, the requirement of showing that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct is met. *Id.*

Mother has been imprisoned three times. Mother was arrested for the third time only days after giving birth to Kristen and before Kristen was even released from the hospital. At the time of trial, Father was twenty-eight years old and had been convicted of ten felonies. Mother and Father's incarceration had affected their ability to ensure that their children were properly taken care of and indicated a course of conduct that was endangering to the children. Moreover, both parents' incarcerations prevented them from finding better living conditions and financially supporting the children. The evidence showed that Mother and Father's continued criminality had contributed to the dangerous environment in which the children had lived. *See In re M.R.,* 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (observing that father's incarceration affected his ability to ensure that his child was properly taken care of, prevented him from finding better living conditions or providing financial support for the child, and indicated a course of conduct that was endangering to his child). Each parent repeatedly committed criminal acts that subjected them to the possibility of incarceration. While imprisonment alone is not a basis to terminate parental rights, it is an

14

appropriate factor to consider. *See In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.). Each time these parents were jailed, they were absent from their children's lives and unable to provide a home or support, which negatively impacted the children's living environment and well-being. *Id.*; *see D.M.*, 58 S.W.3d at 812–13 (noting that mother's frequent incarcerations affected her ability to properly care for her children); *M.R.*, 243 S.W.3d at 819; *In re C.L.C.*, 119 S.W.3d 382, 393 (Tex. App.—Tyler 2003, no pet.) (holding that it is sufficient that the parent was aware of the potential for danger to the child and disregarded that risk); *In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that the creation of an "emotional vacuum" in the child's life by being absent for more than twelve months due to incarceration was evidence of endangering the child's emotional well-being). Mother could have been released in time to attend the termination hearing, but her frequent misbehavior in prison delayed her release. *See In re J.N.R.*, 982 S.W.2d 137, 143 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (affirming the termination of father's parental rights based in part on evidence that father continued to engage in the criminal activity that resulted in his incarceration even after knowing his parental rights were in jeopardy). The CASA advocate testified that CASA changed its plan from reunification to termination when it discovered that the parents had misbehaved in prison so to as extend their confinement. The advocate said, "[W]e were coming on nine months, they were still

15

incarcerated. I had learned they had done some things to make their incarceration even longer."

There was much testimony regarding Mother's selfish nature, that she's "too prone to care about what [she] wants instead of . . . what's the best thing." Grandmother stated that she did not think Mother showed respect for the process of getting her children back. Brenda, the guardian of Mother's oldest child and adoptive parent of Mother's second child, testified that she doesn't believe Mother will ever be an effective parent. Brenda testified that Mother told CPS that Brenda had "kidnapped" the children that Brenda has custody of. Mother also alleged that Brenda had sexually assaulted Katrina when she was eight months old. Brenda testified that the accusations were unfounded and she was never charged for anything. Grandmother stated that the children receive no benefit from having Mother or Father in their life at the moment. As of the date of trial, Grandmother's husband (Grandfather) did not think Mother was able to raise her children. Grandmother testified that she thought Father was a good father, but admitted that he had only been present in Caitlin's life for the first year. She also described him as being a selfish person who makes bad decisions. Grandfather thought that Father was maturing, but as of the date of trial, he was still unable to take the children.

We hold there is legally and factually sufficient evidence that Father endangered the children's physical well-being and that there is legally sufficient evidence that Mother endangered the children's physical well-being. We

overrule Father's third and fourth issues and Mother's third issue. Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is necessary to support a judgment of termination, we need not address Mother and Father's remaining issues. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2007, no pet.).

### III. Conclusion

Having overruled all of the appellants' dispositive issues, we affirm the trial court's judgment.

LEE GABRIEL
JUSTICE

PANEL:  LIVINGSTON, C.J.; MEIER and GABRIEL, JJ.

DELIVERED:  May 5, 2011